UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

PHYLLIS DELANEY and
GEORGE DELANEY,
                *Plaintiffs,*

          v.

VIRGINIA DEPARTMENT OF SOCIAL
SERVICES, CHILD PROTECTIVE
SERVICES, *et al.*,
                *Defendants.*

Case Number 1:24-cv-00035-MSN-IDD

<u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (ECF 15), Plaintiffs' Motion to Amend for Misnomer (ECF 18), and Defendant's Motion to Strike (ECF 20). Plaintiffs in this case are Phyllis and George Delaney. The named Defendants are Virginia Department of Social Services, Child Protective Services (hereinafter "DFS"[1]), LaDonna Sanders ("Sanders"), Jiyah Stewart[2] ("Stewart"), and Sanchez Glover ("Glover"). The three individual defendants were all, at the times relevant, DFS employees.

Plaintiffs allege DFS and individual Defendants' actions and omissions placed their infant grandson Kaiden in grave danger, interfered with their custody proceedings over Kaiden, interfered with their relationship with their adult daughter to whom they are guardians, discriminated against them, and violated Virginia law. Plaintiffs' federal claims arise under 28 U.S.C. § 1983, and they allege that Defendants' actions violated their rights under the Fourteenth Amendment of the United States Constitution. Because DFS—however named—is not

---

[1] Plaintiffs' Amended Complaint names as a defendant "Virginia Department of Social Services, Child Protective Services." That Complaint was served upon and the factual allegations appear to apply to the Fairfax County Department of Family Services.

[2] Plaintiffs' Amended Complaint several times spells Stewart's name as "Jiyad Stewart."

subject to suit under Virginia law, Plaintiffs cannot state a claim against it. Plaintiffs also lack standing to bring their claims regarding harm to their grandson and have not stated a claim with respect to any of their Fourteenth Amendment or Virginia law claims. Therefore, the Court will grant Defendants' Motion to Dismiss Plaintiffs' Motion to Amend and Defendants' Motion to Strike as moot.

## I.   BACKGROUND

### A.  Factual History

Plaintiffs are the legal guardians of their adult daughter, Makayla Delaney, who suffers from fetal alcohol syndrome, bipolar disorder, post-traumatic stress disorder, attention deficit hyperactive disorder, reactive attachment disorder, and borderline personality disorder. ECF 4 ("Compl." or "Complaint") at 2.  Makayla is the biological mother of Kaiden Delaney, Plaintiffs' grandson, who was born on November 19, 2021. *Id.* Kaiden's biological father is Jevante Dyson. *Id.*

#### i.  Defendants' failure to ensure Kaiden Delaney's safety during his infancy

Plaintiffs first became concerned about Kaiden's safety just five days after he was born, when they noticed bruises on him. *Id.* The next day, Makayla, apparently then living at home with her parents, made calls to the police and attempted to travel with Kaiden to Capitol Heights, Maryland, where Dyson resided. This attempt was unsuccessful, and Makayla instead went to "Merrifield" to be evaluated.[3] *Id.* at 2-3. After Makayla returned from Merrifield, Plaintiffs told her she could travel to Capitol Heights but could not take Kaiden because they were concerned for his safety there. *Id.* at 3. Makayla ignored these instructions and took Kaiden to Capitol Heights with the intent to relocate there and remain with Dyson. *Id.* at 3-4.

---

[3] As Defendants note, "Merrifield" likely refers to the Sharon Bulova Center for Community Health, an emergency crisis behavioral health treatment center. ECF 15 at 4 n.2.

Plaintiffs reported the bruise they had observed on Kaiden to Stewart, a specialist with DFS, and to the Fairfax County Police. *Id.* at 4. DFS did not conduct an assessment or investigation. *Id.*

At some point after November 25, 2021, Plaintiffs saw a photograph of Kaiden on Makayla's Instagram page that showed the infant sleeping on Dyson's chest. *Id.* The photograph showed visible scratches on Dyson's chest, indicating he had recently been involved in a physical altercation. *Id.* Plaintiffs once again told Makayla that they were concerned for Kaiden's safety in Capitol Heights. *Id.*

On December 1, 2021 Stewart called Phyllis Delaney and said she was planning to visit Plaintiffs' home, and that she would not meet with Makayla or Dyson prior to that visit. *Id.* at 4-5. Contrary to that assurance, Stewart asked Makayla and Dyson to bring Kaiden to her office in Fairfax County before the home visit. *Id.* at 5. Stewart also failed to transmit any details about Kaiden's case to officials in Prince George's County, Maryland, which includes Capitol Heights. *Id.*

Beginning on December 24, 2021, Kaiden showed signs of illness including fever, coughing, runny nose, sneezing, and difficulty breathing. *Id.* at 7-8. Based on information they received about Kaiden's condition, Plaintiffs again filed a complaint with Defendant Sanders of DFS, requesting an investigation. *Id.* at 8-9. Sanders did not open a new investigation or transmit the existing investigation regarding Kaiden to Prince George's County. *Id.* at 10.

On January 7, 2022, Plaintiffs contacted Makayla and urged her to take Kaiden in for emergency care. *Id.* at 11. The next day Sanders, along with a representative from Prince George's County, contacted Plaintiffs to inform them that Kaiden was hospitalized with a severe brain injury, labored breathing, vomiting, oral bleeding, COVID, and flu. *Id.* at 11-12. Sanders asked

Plaintiffs if they would take custody of Kaiden and informed them that if they declined, Kaiden would be placed into foster care. *Id.* at 12. Then, on January 9, Kaiden was admitted to the hospital's neonatal intensive care unit after an MRI showed bleeding in his brain. *Id.* at 12.

On January 11, 2022, Plaintiffs filed an emergency motion for temporary custody of Kaiden in state court in Fairfax County. *Id.* at 13. That court granted that motion two days later, the day that Kaiden was discharged from the hospital with diagnoses of nonaccidental traumatic head injury, hemorrhages, thrush, COVID, flu, and seizures. Sanders was the DFS officer assigned to the case after that, and conducted interviews with Makayla and Dyson, as well as a home visit with Plaintiffs. *Id.* at 14. DFS closed the case on March 25, 2022. *Id.*

On May 17, Plaintiffs spoke to Glover, Sanders's supervisor, to ask about the status of DFS' investigation into Kaiden's safety. *Id.* at 16. Glover indicated the case would be closed shortly. *Id.*

### ii. Defendants' interference with Plaintiffs' application to "Kinship Care" and investigations into Plaintiffs

Throughout the period described in Plaintiffs' complaint, Defendants conducted investigative efforts regarding the safety of Plaintiffs' home and their capacity to care for Kaiden. Despite these investigations, Defendants did not provide Plaintiffs with complete information regarding those investigations. On December 20, 2021, Stewart communicated to Plaintiffs that the site visit to their home was planned in order to see the home in which she believed Makayla and Kaiden would be living and told Plaintiffs there had not been any complaints against them. *Id.* at 5-6. That information was false, since there had been a complaint against Plaintiffs and not their daughter Makayla. *Id.* at 24.

Furthermore, after Kaiden's paternal grandmother instituted custody proceedings, Defendants, along with Kaiden's guardian ad litem, "exerted influence" in the proceedings and did

not provide Plaintiffs with all necessary information, such as Kaiden's guardian ad litem's report. *Id.* at 17. Kaiden's maternal grandmother eventually withdrew her petition for custody. *Id.*

Finally, after obtaining custody of Kaiden, Plaintiffs became interested in applying for the "Kinship Care Program." *Id.* at 15. Sanders then sent Plaintiffs a letter indicating that Plaintiffs had concerns about their financial ability to care for Kaiden, as well as other explanations why they were ineligible for Kinship Care. *Id.* at 15. These explanations were false and misleading. *Id.* at 15. As a result Plaintiffs did not have an opportunity to apply for Kinship Care. *Id.* at 16.

### iii. Defendants' interference with Plaintiffs' relationship with their daughter, Makayla

Throughout 2022, Makayla physically and verbally abused Plaintiffs during several visits to their home, and Plaintiffs informed Sanders of this behavior. *Id.* at 18-19. Later, on September 15, Sanders arrived at Plaintiffs' home and brought Makayla inside. *Id.* at 19-20. Makayla was aggressive and violent during that visit, and Sanders did not take any steps to de-escalate the events *Id.* at 20. Makayla was later arrested for assaulting Phyllis Delaney, and Plaintiffs filed for a protective order. *Id.* at 21. Despite Makayla's aggressive and violent actions, Sanders remained in touch with her, and offered to assist her in applying for custody of Kaiden. *Id.*

During this same period, Makayla's living situation grew more fragile, and Sanders remained involved. The owner of the Capitol Heights home where she resided wrote a letter saying that Makayla could no longer reside there due to non-payment of rent. *Id.* at 22. Plaintiffs believe that the letter was fabricated with Sanders' knowledge. *Id.*

### iv. Defendants' discrimination against Plaintiffs

Plaintiffs also allege that in the course of their interactions DFS employees treated them as "invisible" or "not smart enough." Compl. 28. Plaintiffs believe that this treatment was "solely on account of [their] age and at times [their] race." *Id.*

5

**B. Procedural History**

Plaintiffs filed their Amended Complaint, operative here, on May 17, 2024. On June 12, 2024, Defendants moved to dismiss Plaintiffs' Amended Complaint under Fed. R. Civ. P. 12(b)(6). ECF 14. Defendants filed a memorandum in support of that motion arguing that all claims against DFS should be dismissed on account of misnomer and *non sui juris*, that Plaintiffs had not stated a claim under the Fourteenth Amendment against the individual defendants, and that the individual defendants alleged actions were shielded under the doctrine of qualified immunity. *See* ECF 15 ("MTD").

Plaintiffs filed an Opposition to Defendants' Motion on July 8, 2024 (ECF 17). That same day, they also filed a Motion to Amend for Misnomer (ECF 18). On July 11, 2024, Defendants moved to strike Plaintiffs' Opposition (ECF 20), and responded to Plaintiffs' Motion to Amend (ECF 22).

**II. LEGAL STANDARD**

Under Fed. R. Civ. P. 12(b)(6), a court may dismiss a claim when the complaint fails "to state a claim upon which relief can be granted." To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When considering a motion under Ruler 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences in favor of the plaintiff." *E.l. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted).

A *pro se* complaint should be liberally construed. *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978). But the Court's "task is not to discern the unexpressed intent of the plaintiff." *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006). Nor does the liberal pleading standard

"excuse a clear failure in the pleadings to allege a federally cognizable claim." *Laber v. United States DOD*, No. 3:21-cv-502, 2021 WL 5893293, at *2 (E.D. Va. Dec. 13, 2021) (citing *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 390-91 (4th Cir. 1990)).

## III.   ANALYSIS

### A.  Plaintiffs have not stated a claim against DFS, which cannot be sued

Defendants first argue that this case should be dismissed against DFS for misnomer, and because DFS is not a legal entity capable of being sued. MTD 6-8. The Complaint names the "Virginia Department of Family Services, Child Protective Service" as a Defendant. As Defendants point out in their Motion to Dismiss, service was made on the Executive Director of the Fairfax County Department of Family Services, and all the individual named Defendants are current or former employees of *that* entity. *Id.* at 6. In response, Plaintiffs entered a Motion to Amend for Misnomer, and substitute "Fairfax County Department of Family Services" for "Virginia Department of Family Services" in their Complaint. ECF 18 at 1-2.

This Court need not resolve Plaintiffs' Motion to Amend because Plaintiffs cannot sue DFS in federal court even if it is properly named. As Defendants note, whether a state entity has the capacity to be sued depends on the law of the state in which this Court is located. MTD 7 (citing Fed. R. Civ. P. 17(b)); *see Owens v. Baltimore City State's Atty's Office*, 767 F.3d 370, 392-93 (4th Cir. 2014). This Court must therefore look to Virginia law to determine whether DFS is subject to suit—that is, whether it has "legal existence separate and apart from Fairfax County," or if "the Code of Virginia" "provide[s] that it can be sued as a separate entity." *Muniz v. Fairfax Police Dept.*, No. 1:05-cv-466-JCC, 2005 WL 1838326, at *2 (E.D. Va. Aug. 2, 2005); *see also Mercer v. Fairfax County Child Protective Servs.*, 2015 WL 5037636, at *3 (2015). Virginia law does not establish DFS as a separate legal entity. Rather, it states that counties, including Fairfax County,

shall establish such a department as a component of the county. Va. Code Ann. § 15.2-823. Furthermore, no provision in Virginia law provides that DFS can be sued separately from the County government itself. Therefore, DFS lacks the capacity to be sued and Plaintiffs' claims against it are dismissed with prejudice.[4]

**B.  Plaintiffs have not stated a Section 1983 claim against the individual defendants**

Plaintiffs allege three different violations of the Fourteenth Amendment. First, they allege that DFS' failure to timely investigate or intervene in Kaiden's situation during the first weeks and months of his life "denied Kaiden the procedural protections owed to him under the law," "placed [him] in danger," "contributed to a continued risk to his safety," "violate[d] his due process," and amounted to "a state-created danger." Compl. 26-27. Second, Plaintiffs allege that Defendants interfered with their right to familial privacy by exerting improper influence over their relationship with both their grandson and their daughter. Compl. 7, 22, 26. Third Plaintiffs claim Defendants violated their procedural due process rights through their interference in custody proceedings and false statements made when Plaintiffs sought to apply for Kinship Care. Compl. 15. Finally, Plaintiffs argue that they were discriminated against based on age and race in violation of the Equal Protection clause.

**i.  Kaiden's safety**

**a.  Article III standing**

Article III standing is a core "constitutional limitation[] on federal court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). This Court "must assure itself of subject matter jurisdiction and may address standing sua sponte." *Lowe v. Brink*, 615 F.Supp.3d 417, 423 (2022) (quoting *Buscemi v. Bell*, 964 F.3d 252, 258 (4th Cir. 2020)) (cleaned up). To show standing, a

---

[4] As explained below, even if DFS were subject to suit, Plaintiff has failed to state a claim under the Fourteenth Amendment as to any Defendant.

Plaintiff must demonstrate that they have (1) suffered an injury in fact, (2) that the injury was caused by the defendants' actions, and (3) that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). Under the doctrine of third-party or "prudential" standing, a plaintiff may bring a claim on behalf of an injured third party, but only if they demonstrate "(1) an injury-in-fact; (2) a close relationship between [themself] and the person whose right she seeks to assert; and (3) a hindrance to the third party's ability to protect his or her own interest." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 215 (4th Cir. 2002) (citations omitted). "Standing is not dispensed in gross." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)). "Rather, a plaintiff must demonstrate standing for each claim he seeks to press." *Id.* (citation omitted) (cleaned up).

Plaintiffs' Complaint does not establish their standing to bring claims regarding Defendants' failure to ensure Kaiden's safety. While the Complaint recites a string of injuries, they are all injuries suffered by Kaiden, who is not a plaintiff. *See* Compl. 26-27. Plaintiffs may not invoke the doctrine of third-party standing because, once again, Plaintiffs have not identified an injury *to them* arising from Defendants' actions or omissions with respect to Kaiden's safety. *See Freilich*, 313 F.3d at 215. Because Plaintiffs lack standing, this Court lacks jurisdiction to resolve any of Plaintiffs' claims regarding the harm that befell Kaiden.

### b. Due process

Even if this Court had jurisdiction, Plaintiffs' allegations regarding Kaiden's safety would still fall short of stating a claim upon which relief can be granted. That is because the Fourteenth Amendment does not, as a general matter, protect individuals against harm from third parties that occurs as the result of government inaction. The Due Process Clause of the Fourteenth Amendment "is phrased as a *limitation* on the State's power to act, not as a *guarantee* of certain minimal levels

of safety and security." *DeShaney* v. *Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 195 (1989) (emphasis added). "[I]ts language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.* Accordingly, it generally confers "no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property." *Id.* at 196. In *DeShaney*, the Court considered a Fourteenth Amendment Due Process claim brought by a child who fell into a coma because of persistent abuse by his father. *Id.* at 191-193. The local child protective services had repeatedly received clear warning signs, but did not take any action to protect Joshua. *Id.* The Supreme Court held that these "undeniably tragic" facts did not amount to a constitutional violation. *Id.* at 191, 202-203.

There are two exceptions to *DeShaney*'s general rule. The first is the "special relationship doctrine," which provides that "where the state is in a special relationship to a private individual, it acquires a duty to act on that individual's behalf and its failures to act are measured on a deliberate indifference standard." *Waybright v. Frederick County*, 528 F.3d 199, 207 (4th Cir. 2008). Such a "special relationship" "is all but synonymous with a custodial relationship." *Id.* (citing *DeShaney*, 489 U.S. at 199-200). In other words, the exception applies when the State's relationship with the plaintiff is "the equivalent of incarceration or institutionalization." *Stevenson ex rel. Stevenson v Martin County Bd. of Educ.*, 3 Fed. App'x 25, 29 (4th Cir. 2001). Second, a governmental actor may be held liable under the Due Process Clause for third-party harm under the "state-created danger" doctrine. To establish this sort of liability, "a plaintiff must show that the state actor created or increased the risk of private danger and did so directly through directly through affirmative acts, not merely through inaction or omission." *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015). The doctrine is "narrowly drawn," and the Fourth Circuit has "never issued a

10

published opinion recognizing a successful state-created danger claim." *Callahan v. North Carolina Dep't of Pub. Safety*, 18 F.4th 142, 147 (4th Cir. 2021) (citations omitted).

Plaintiffs cannot state a claim under the Due Process clause, because the harm to Kaiden occurred at the hands of third parties, and neither of the exceptions to *DeShaney*'s general rule applies. As the Complaint describes, Plaintiffs were concerned from the earliest days of Kaiden's life that his parents posed a threat to his wellbeing, based on their direct observations and photographs they saw on social media. Compl. 3-4. And the harms that resulted in Plaintiffs' custody of Kaiden—the brain injury and illnesses in December of 2021—occurred when he under his biological parents' custody and supervision, not at the hands of DFS or its employees. *Id.* at 7-11,

Nor does the conduct fall into either of the exceptions to *DeShaney*'s rule. First of all, Plaintiffs do not allege that Defendants had a "special relationship" with Kaiden at the time he was harmed, and no such inference is warranted. None of the facts in Plaintiffs' Complaint provide any indication that Defendants had a "custodial relationship" with Kaiden. *Waybright*, 528 F.3d at 527. Much the opposite, the Complaint describes in detail Defendants' *failure* to remove Kaiden from the full custody of Makayla and Dyson. Compl. 4, 8-9.

As for the second *DeShaney* exception, Plaintiffs do allege that Defendants "created a state-created danger for Kaiden" through "fabricated and misleading statements . . . regarding the status of complaints and investigations, coupled with their failure to take necessary actions." Compl. 26. But the facts as alleged fail to support the application of that exception, as well. Defendants' "failure to take necessary actions," *id.*, cannot support a claim under the Due Process clause, which requires a Plaintiff to identify "affirmative acts." *Rosa*, 795 F.3d at 439. Plaintiffs point to just one affirmative act by Defendants prior to Kaiden's hospitalization: Stewart's misrepresentations

11

regarding (1) her reasons for the December 2021 home visit and (2) whether there were any complaints against Plaintiffs. Stewart's misrepresentations regarding her reasons for conducting a home visit at Plaintiffs' residence in December 2021, and also falsely told Plaintiffs there were no complaints against them. Compl. 4-6. Kaiden may very well have faced grave harm, but the Complaint does not show how Stewarts inaccurately described site visit to their home "*created* or *increased* the risk of harm.*" Callahan*, 18 F.4th at 146 (quoting *Rosa*, 795 F.3d at 439) (cleaned up). In response, Plaintiffs cite *Currier v. Doran*, 242 F.3d 905 (10th Cir. 2001) in an effort to bolster their state-created danger claim. ECF 17 ("Opp.") at 68. But that case rejected a *DeShaney* defense only "[w]hen the state *affirmatively acts* to remove a child from the custody of one parent and then places the child with another parent." *Currier*, 242 F.3d at 919. That was not the case here.

For these reasons, Plaintiffs' Complaint—insofar as it alleges harm to Kaiden from Defendants' actions and omissions—does not state a claim under Section 1983 and the Due Process Clause of the Fourteenth Amendment.

### ii.   Familial privacy

Plaintiffs Complaint—construed liberally—also appears to allege a cause of action for a violation of their right to familial privacy. Compl. 17, 22, 26; MTD 13. Defendants argue that Plaintiffs have not stated a claim with respect to this prong of Fourteenth Amendment's protections. MTD 13-15.

The Fourth Circuit has recognized that the Fourteenth Amendment's Due Process Clause protects "the sanctity of the family unit," and "the concept of familial privacy." *Hodge v. Jones*, 31 F.3d 157, 163 (1994). These protections have been "restricted by the Supreme Court to (1) thwarting governmental attempts to interfere with particularly intimate family decisions, and (2)

voiding government actions that sever, alter, or otherwise affect the parent/child relationship." *Id.*
Accordingly, courts have "strictly construed actional violations of the familial privacy right to
encompass" instances where state action: (1) was "directly aimed at the parent-child relationship;"
(2) implicated "the right of the family to remain together without the coercive interference of the
awesome power of the state;" (3) "drove a wedge into a family and threatened its very
foundations;" or (4) "eroded the family's solidarity internally and impaired the family's ability to
function." *Id.* at 164 (citations omitted). Violations of this right have been found, for example,
when a state prevents a parent from visiting their child by knowingly misleading a court. *Nelson
v. Green*, 956 F. Supp. 2d 732, 738, 743-750 (W.D. Va. 2013).

Plaintiffs' Complaint makes several allegations that could be construed as presenting a
familial privacy claim. They allege that Defendants "actively engaged in matters directly affecting
our guardianship of our daughter Makayla and have exerted influence over the guardianship of
Makayla and custody arrangements concerning Kaiden," "interfered with our decisions regarding
Makayla's living arrangements," and, on September 15, 2022, engaged in "arbitrary interference
with [Plaintiffs] liberty and property interests" by bringing "Makayla back to the plaintiffs' home."
Compl. 17, 22, 26. At bottom, Plaintiffs appear to allege that Defendants' communications with
their daughter Makayla (over whom Plaintiffs had guardianship) including those regarding her
living arrangements, actions bringing Makayla to their home on September 15, 2022, and
interference with their attempts to obtain custody over Kaiden constituted a violation of their right
to familial privacy.

These facts, even liberally construed, do not rise to the level of a Fourteenth Amendment
violation. With respect to Plaintiffs' claims regarding Makayla, the Complaint does not articulate
the nature of the familial arrangement Plaintiffs sought to preserve. While Plaintiffs did not wish

to allow Makayla to take Kaiden with her to Capitol Heights, they told Makayla that she could go there. Compl. 3. And, as of 2022, Plaintiffs did not wish to have Makayla in their home, repeatedly objecting to her presence there. Compl. 19. Indeed, Plaintiffs sought a protective order against Makayla after she assaulted Phyllis Delaney at Plaintiffs' home in 2022. *Id.* at 21-22. In this context, Defendants' communications with Makayla, including their involvement in her fragile housing situation, have not been shown to have "interfere[d] with particularly intimate family decisions," or "severed, altered, or otherwise interfered with the family relationship." *Hodge*, 31 F.3d at 163.

Plaintiffs also do not state a claim regarding Defendants' interference with their custody over Kaiden. As Plaintiffs Complaint describes, they were able to obtain emergency custody over Kaiden in January 2022. Compl. 13. And nowhere do Plaintiffs allege that Defendants' actions prevented them from obtaining custody, or that Defendants successfully diminished or eliminated their custodial rights. Thus, insofar as Plaintiffs bring a claim regarding "the right of the family to remain together without . . . coercive interference," *Hodge*, 31 F.3d at 163 (citation omitted), they have not shown that Defendants actually interfered with that right.

For these reasons, Plaintiffs have failed to state a claim for familial privacy under the Fourteenth Amendment.

### iii.    Procedural due process

To prevail on a procedural due process claim, a Plaintiff must demonstrate "deprivation by state action of a protected interest in life, liberty, or property," and "inadequate state process" accompanying that deprivation. *Reed v. Goertz*, 598 U.S. 230, 236 (2023). When a person asserts a property interest in a government benefit, he "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim

of entitlement to it." *Mallette v. Arlington Cnty. Emps.' Supp. Retirement Sys. II*, 91 F.3d 630, 634 (4th Cir. 1996) (citing *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 568 (1972)).

Plaintiffs raise three apparent Procedural Due Process claims under the Fourteenth Amendment, which Defendants likewise argue are inadequately pled. *See* MTD 16-17. The first involves Sanders' misrepresentations to Plaintiffs regarding whether they were subject to a DFS investigation. Second, they allege that Defendants exerted improper influence in their child custody proceedings, and did not provide them with necessary information. Third, Plaintiffs claim that Defendants' falsification and withholding of information relating to their application to Kinship Care also violated their procedural due process rights.

Each of Plaintiffs' alleged procedural due process violations fail at the first step, since they have not shown they were deprived of a protected interest in life, liberty, or property. First, while Sanders may have misrepresented the fact that DFS was investigating Plaintiffs, that procedural misrepresentation was not part of a deprivation of any liberty or property interest. Even construing Plaintiffs' complaint to find that the interest at issue was their custody of Kaiden, the Complaint makes clear that Plaintiffs *gained* custody when they sought it, Compl. 13, and nowhere alleges that they were deprived of custody. The same goes for Defendants' influence on and refusal to provide information regarding their custody proceedings. Even if Plaintiffs received inadequate process, Plaintiffs have not shown that they were ever deprived of any life, liberty, or property interest. Plaintiffs seek to support their position by citing to *Santosky v. Kramer*, 455 U.S. 745 (1982). MTD Opp. 67-68. That case, however, involved parental termination proceedings and "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child." *Santosky*, 455 U.S. at 753. As just explained, Plaintiffs, who were not subjected to the termination of any parental or custodial rights, have not identified such an interest here.

Finally, Plaintiffs have not shown that they have a property interest in Kinship Care, such that its deprivation could constitute a due process violation. Plaintiffs' Complaint does not define "Kinship Care" or the conditions for eligibility in the program, but their Opposition to Defendants' Motion to Dismiss states that it is "the care of children by relatives or close family friends," and is "recognized as a valuable alternative to traditional foster care." MTD Opp. 63. Even if Plaintiffs had included this additional detail in their Complaint, it does not establish that Kinship Care is a program to which they had a "legitimate claim of entitlement" based on objective criteria. *Mallete*, 91 F.4th at 934. In response to Defendants' arguments regarding Kinship Care, Plaintiffs point to *Wolf v. Fauquier County Board of Supervisors*, 555 F.3d 311 (4th Cir. 2009). MTD Opp. 67. But the Fourth Circuit there *rejected* procedural due process claims arising from a social services agency's alleged false allegations, misleading filing of a protective order, and creation of a fraudulent affidavit in the context of a familial relationship claim. *Id.* at 322-323. Moreover, *Wolf* does not change the fact that Plaintiffs have not pointed to any deprivation of life, liberty, or property with respect to their efforts to apply for Kinship Care.

Because Plaintiffs have not pled facts sufficient to establish that they were deprived of any life, liberty, or property interest within the scope of the Fourteenth Amendment's protections for procedural due process, this Court must dismiss those claims. [5]

### iv.   Equal protection

Plaintiffs assert in their Complaint that Defendants' actions and omissions were "based on discriminatory reasons," violating their "rights to equal protection under the law." Compl. 26. Plaintiffs state that they "saw indications of discrimination, particularly with regards to age-related

---

[5] Plaintiffs also reference a deprivation of a liberty interest in "feeling safe in their own home." Compl. 26. Plaintiffs have not identified any state statute or procedure that creates such a liberty interest, *see Stewart v. Bailey*, 7 F.3d 384, 392 (4th Cir. 1993), or what inadequate process deprived them of that interest, *Reed*, 598 U.S. at 236.

bias," including DFS employees treating them as "invisible." *Id.* at 28. Plaintiffs claim that these indications also "suggest[] a pattern of racial discrimination." *Id.* Defendants again seek dismissal on the ground that Plaintiffs' allegations of discrimination are conclusory. MTD 23-24.

Plaintiffs have not alleged facts sufficient to state a Equal Protection Clause claim. "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). While Plaintiffs object to their treatment by Defendants, their Complaint does not allege that they were treated differently from other, similarly situated individuals of different ages or races. Indeed, the Complaint does not even identify Plaintiffs' own age or racial identity. Plaintiffs "[f]actual allegations" allegations are therefore insufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. 544, 555 (2007).

### C.  Individual defendants' qualified immunity

The individual Defendants also raise the defense of qualified immunity as to Plaintiffs' substantive due process claims. MTD at 17-19. A governmental official is entitled to qualified immunity regarding suits for alleged constitutional violations unless (1) "the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right," and (2) "the right at issue was clearly established at the time of the alleged misconduct." *Doe ex rel. Johnson v. South Carolina Dept. of Soc. Servs.*, 597 F.3d 163, 169 (4th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)) (cleaned up). Because this Court has found that Plaintiffs have not alleged facts sufficient to "make out a violation of a constitutional right," *see supra* sections II.B.1.b, II.B.2, the individual defendants are entitled to qualified immunity regarding those claims.

**D. State law violations**

Plaintiffs also allege that Defendants' Conduct violated Virginia statutory and common law provisions.

Plaintiffs first allege that individuals engaged in financial exploitation of their daughter Makayla, in violation of Va. Code Ann. § 18.2-178.1. Compl. 23. That law protects "vulnerable adults" from financial exploitation through use of that vulnerable adult's impairment. Plaintiffs have not stated a claim under this provision against Defendants. For one, the individuals who allegedly exploited Makayla are not among the named defendants in this case. And even if they were, Plaintiffs have made no effort to meet the elements of the statute, including by alleging facts to show that Defendants knew of Makayla's vulnerability, took advantage of it, and converted money with the intent to deprive her of it. Va. Code Ann. § 18.2-178.1(B).

Plaintiffs also cite to Va. Code Ann. § 63.2-1509, which requires social workers or family-services specialists like the individual Defendants to report any suspected abuse or neglect to the relevant local governmental authority. Compl. 23-24. That provision provides for fines and criminal penalties for a failure to report, but it does not create a private right of action. *See B.S. ex rel. Stukes v. Parkman*, No. 2:17-cv-489, 2018 WL 1011091, at *4 (E.D. Va. Aug. 2, 2018).

Finally, Plaintiffs' Complaint recites "Intentional Infliction of Emotional Distress" on its cover page. Compl. 1. But nowhere else in the Complaint do Plaintiffs attempt to articulate or plead facts satisfying the elements of such a claim under Virginia law. *See Hatfill v. New York Times Co.*, 416 F.3d 320, 336 (4th Cir. 2005). As such, any claim for intentional infliction of emotional distress is wholly conclusory.

For these reasons, this Court will dismiss Plaintiffs' claims under Virginia law.

## IV.    CONCLUSION

Because Plaintiffs have failed in their Complaint to state any claim which would entitle them to relief, the Court will grant Defendants' Motion to Dismiss and dismiss Plaintiffs' Amended Complaint.

Accordingly, it is hereby

**ORDERED** that Defendants' Motion to Dismiss (ECF 14) is **GRANTED**; and it is further

**ORDERED** that Plaintiffs' claims against Defendant DFS are **DISMISSED** with prejudice as *non sui juris*; and it is further

**ORDERED** that Plaintiffs' claims under 42 U.S.C. § 1983 and the Fourteenth Amendment relating to harms that befell their grandson Kaiden are **DISMISSED** with prejudice for lack of jurisdiction; and it is further

**ORDERED** that Plaintiffs' claims under 42 U.S.C. § 1983 and the Fourteenth Amendment are **DISMISSED** without prejudice for failure to state a claim; and it is further

**ORDERED** that Plaintiffs' Virginia statutory claims are **DISMISSED** with prejudice for failure to state a claim; and it is further

**ORDERED** that Plaintiffs' claim for intentional infliction of emotional distress under Virginia law is **DISMISSED** without prejudice; and it is further

**ORDERED** that Plaintiffs' Motion to Amend (ECF 18) and Defendants' Motion to Strike (ECF 20) are **DENIED** as moot.

**IT IS SO ORDERED.**

/s/ Michael S. Nachmanoff
Michael S. Nachmanoff
United States District Judge

July 31, 2024
Alexandria, Virginia